# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

BARTON STUCK,
    *Defendant*.

No. 3:18-cr-28 (JAM)

**RULING RE SCOPE OF RELEVANT CONDUCT FOR SENTENCING**

As federal practitioners well know, the U.S. Sentencing Guidelines follow a "modified real-offense" system of sentencing. It is a not-so-popular compromise between the extremes of a "charge offense" system and a "real offense" system. *See generally* Julie R. O'Sullivan, *In Defense of the U.S. Sentencing Guidelines' Modified Real-Offense System*, 91 Nw. U. L. Rev. 1342 (1997).

In a charge-offense system, a judge bases a sentence solely on the defendant's charged and proven conduct, while disregarding any uncharged misconduct no matter how obvious. By contrast, in a real-offense system, a judge may base a sentence on all manner of uncharged facts or other crimes that a judge concludes to be the "real" offense worthy of punishment.

With its adoption of a modified real-offense system, the Sentencing Guidelines try to strike a balance between the formalistic limits of a charge-offense system and the potential for unfair excess of a real-offense system. It's not easy to do. The Guidelines' solution is a concept known as "relevant conduct." *See* U.S.S.G. § 1B1.3. If a defendant pleads guilty to one crime but the prosecution thinks that he should be sentenced as well for other crimes, then these other crimes may count toward a defendant's offense level under the Guidelines if they qualify as "relevant conduct." It is the meaning and limits of the Guidelines "relevant conduct" provision that is the focus of this ruling.

Defendant Barton Stuck pleaded guilty to a $50,000 fraud that occurred in late 2015. But the Government insists that for several years before, from 2006 to 2011, he raked in another $8.7 million by defrauding his investors. The Government did not charge Stuck with this prior fraud, but it argues that the prior fraud qualifies as "relevant conduct" and thereby warrants an enormous enhancement of several years' imprisonment for Stuck under the Sentencing Guidelines.

I do not agree. I find that Stuck's uncharged fraud does not meet the definition of "relevant conduct" under the Sentencing Guidelines. And even if I were to conclude that the uncharged fraud met the definition of "relevant conduct," I would likely exercise my discretion to vary downward. In my view, it does not promote respect for the law for a court to accept a defendant's guilty plea on one charge and then to impose a sentence that is driven and dominated by much older conduct that the Government has not chosen to charge as a crime and to which the defendant has not admitted as part of his plea agreement.

## BACKGROUND

Defendant Barton Stuck controlled a group of related business entities—known as the "Signal Lake entities"—through which investors could invest in various technology companies. He solicited millions of dollars in investments until his funds failed in 2011, with large losses for many investors.

The Government has filed a memorandum detailing specific losses to particular Signal Lake investors from 2006 to 2011. Doc. #50 at 4-19. Stuck does not dispute that his investors from that era lost money but he does dispute the Government's contention that these losses were due to his fraud. All told, the Government alleges that Stuck defrauded investors of about $8.7

2

million from 2006 to 2011, with the lion's share of these losses occurring before 2009. *Ibid.* The Government does not identify any specific investor losses occurring after April 2011.

In response to investor complaints, the Federal Bureau of Investigation (FBI) launched a criminal investigation. In August and September 2015, an undercover FBI agent posed as a person who wished to buy out the Signal Lake stake of one of Stuck's investors. Stuck tried to defraud the undercover agent. He falsely assured the agent that his investment would quickly double in value. Stuck also wildly exaggerated Signal Lake's bank holdings. Stuck further solicited from the agent a $50,000 "repayable fee," supposedly to cover the additional accounting and legal fees that Signal Lake would incur in the transfer of the investment interest. At Stuck's behest, the agent wired the "fee" of $50,000 to a Wells Fargo account in October 2015.

More than two years went by before the Government charged Stuck in February 2018 with wire fraud based on his effort to defraud the FBI undercover agent. Doc. #1. Stuck has entered a guilty plea to the wire fraud charge as well as to additional crimes of related money laundering and false statements to the U.S. Securities and Exchange Commission (SEC).[1]

Stuck now faces sentencing, but the parties do not agree on how the Sentencing Guidelines should apply in this case. Their disagreement is about how I should calculate "loss" for purposes of U.S.S.G. § 2B1.1(b). Although the parties agree that Stuck's "loss" calculation should include the $50,000 that he solicited from the FBI agent in 2015, they disagree whether it should include any losses of the Signal Lake investors from 2006 to 2011. As noted above, the Government maintains that Stuck defrauded his investors of about $8.6 million from 2006 to

---

[1] Because the parties agree that the "relevant conduct" enhancement at issue in this ruling is based solely on its relevance to the wire fraud count rather than to the additional counts of the indictment, I need not describe them more fully now but will take these additional crimes into consideration at sentencing.

2011, and it suggests—consistent with a stipulation in the plea agreement—that I should adopt a conservative estimate of a total loss of $3.5 million for Sentencing Guidelines purposes.

For a $50,000 loss, Stuck's offense level would be increased by 6 levels. *See* U.S.S.G. § 2B1.1(b)(1)(D) (loss between $40,000 to $95,000). But for a $3.5 million loss, Stuck's offense level would be increased by 16 levels. *See* U.S.S.G. § 2B1.1(b)(1)(I) (loss between $1.5 and $3.5 million). Moreover, because the alleged fraud from 2006 to 2011 involved many more victims, Stuck's sentencing offense level would be subject to, as the presentence report recommends, an additional 2-level increase for more than 10 victims. *See* U.S.S.G. § 2B1.1(b)(2)(A)(i).

The upshot is that, if I include Stuck's alleged investor fraud from 2006 to 2011 in the Guidelines calculation, Stuck's offense level will increase by at least 12 more levels. This increase would result in a Guidelines range for imprisonment that is about four times as high as it would be without these enhancements.[2]

The parties have filed extensive submissions and requested that I decide whether Stuck's prior fraud losses from 2006 to 2011 qualify as "relevant conduct" for purposes of the Sentencing Guidelines. Although Stuck reserves the right to contest the truth of the Government's allegations that he previously defrauded investors, his principal argument at this time is that—even accepting the Government's factual allegations as true—the prior losses at issue are too dissimilar and too distant in time to qualify as "relevant conduct" for purposes of the Sentencing Guidelines.

---

[2] The draft presentence report recommends a final adjusted offense level of 28. Doc. #58. This is based on the Probation Office's recommendation that I adopt an even higher loss figure of between $3.5 million to $9.5 million. If I were to adopt instead the Government's proposed loss figure of $3.5 million and the other calculations set forth in the presentence report, Stuck's offense level would be Level 26, which corresponds to a sentencing range of 63-78 months. If 12 levels were subtracted from this offense level, which is the level increase associated with a loss of $3.5 million and more than 10 victims, then Stuck's offense level would be Level 14, which corresponds to a sentencing range of 15-21 months imprisonment.

## DISCUSSION

The U.S. Sentencing Guidelines instruct a court to calculate a defendant's offense level not only on the basis of the conduct for which a defendant has been convicted but also on the basis of all "relevant conduct"—conduct including other criminal acts for which a defendant has *not* been charged or convicted. *See* U.S.S.G. § 1B1.3. The Guidelines define "relevant conduct" in pertinent part to mean conduct that was "part of the *same course of conduct* or *common scheme or plan* as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (emphasis added).[3]

As the Second Circuit has explained, there is a conceptual distinction between whether two sets of crimes (one charged and one uncharged) are part of "the same course of conduct" or whether they are part of a "common scheme or plan." *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993). Accordingly, I must consider whether Stuck's uncharged conduct from 2006 to 2011 qualifies as either a "common scheme or plan" *or* as "part of the same course of conduct" as the wire fraud conduct in 2015 to which he has pleaded guilty.[4]

### *Common scheme or plan*

The application note to the Guidelines does not purport to provide a comprehensive definition of the term "common scheme or plan." Instead, it simply describes some of the typical or characteristic factors of a "common scheme or plan," suggesting that the uncharged conduct and charged conduct "must be substantially connected to each other by at least one common

---

[3] This is the controlling inquiry for crimes that are ordinarily "grouped" under U.S.S.G. § 3D1.2(d), which includes Stuck's offense of conviction (wire fraud), because the offense level is based in large part on a cumulative quantitative figure such as monetary loss or drug amount. In addition, for crimes involving "jointly undertaken activity," the definition of "relevant conduct" extends under certain circumstances to activities of co-conspirators. *See* U.S.S.G. § 1B1.3(a)(1)(B). This latter provision does not apply here because the Government does not seek to attribute the conduct of any other person to Stuck.

[4] Although Stuck pleaded guilty to four different crimes, the parties agree that the inquiry here is solely as to whether any uncharged conduct is "relevant conduct" with respect to the $50,000 fraudulent transaction that forms the basis for the wire fraud charged in Count One of the indictment.

5

factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3(a)(2) cmt. 5(b)(i). The note thus describes a minimum floor (that there be "at least one common factor" for there to be a "common scheme or plan"), but it does not describe the rest of the proverbial house in terms of what degree of commonality should exist for a court to conclude that there was a "common scheme or plan."[5]

The Second Circuit has rejected the notion that a "common scheme or plan" exists whenever it can be said that there is anything in common between two sets of crimes. Accordingly, "[t]he fact [a defendant] was personally enriched by the two sets of crimes is not by itself enough to establish a common scheme or plan." *United States v. LaBarbara*, 129 F.3d 81, 87 (2d Cir. 1997). Moreover, even if there are "some similarities" such as a defendant's "greed" or even "a temporal overlap," the Second Circuit has ruled that there is no "common scheme or plan" if "the differences between the two sets of crimes easily outweigh the similarities." *Id.* at 86-87.

Most significantly for present purposes, the Second Circuit has also concluded that a "common scheme or plan" requires no less than "a connection among participants and occasions." *United States v. Dixon*, 175 F. App'x 384, 385 (2d Cir. 2006) (quoting *Shonubi*, 998

---

[5] The application note also provides the following example of a "common scheme or plan":

> For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of *modus operandi* (the same or similar computer manipulations were used to execute the scheme).

U.S.S.G. § 1B1.3(a)(2) cmt. 5(b)(i).

6

F.2d at 89). Put differently, if there is no connection among the participants and occasions, then it cannot be said that there was a "scheme or plan" at issue, much less one that is "common."

Here, notwithstanding some similarities between Stuck's conduct during 2006-2011 and his offense of conviction (such as Stuck's motive of greed and his involvement with the Signal Lake entities), I do not see enough to conclude that the two periods of activity are linked by a "common scheme or plan." As the Second Circuit has noted, "[t]he mere fact, however, that, in engaging in a pattern of criminal behavior, the defendant has as his purpose the acquisition of money to lead a particular lifestyle does not mean either that he had devised a single common scheme or plan or, if he had, that his course of conduct was necessarily part of it." *United States v. Chartier*, 970 F.2d 1009, 1016 (2d Cir. 1992).

More is required than a showing of a common pecuniary motive to establish a common scheme or plan. There is no suggestion here, for example, of common victims. The uncharged conduct involves actual investor victims, while the charged conduct involves a "victim" FBI agent. It is true that Stuck induced people to part with their money but that is really the only similarity, and that commonality is at too high a level of generality to constitute a "common scheme or plan." The four-and-a-half-year time gap between the last time that Stuck allegedly took money from actual victim investors in April 2011 and the one time that he took money from the undercover FBI agent in October 2015 also weakens any inference of some ongoing "scheme" or "plan."

To the extent there are any "common" elements at play, this has to do in part with choices made by the Government as part of its undercover "sting" operation (for example, to conduct a ruse using one of Stuck's prior Signal Lake investors as an intermediary). All in all, I am not

7

convinced—as the Second Circuit requires—that there is the necessary "connection among the participants and occasions" for there to be a "common scheme or plan."

### *Same course of conduct*

That brings me to whether the uncharged conduct from 2006 to 2011 and the charged conduct in 2015 were all part of the "same course of conduct" for purposes of the "relevant conduct" determination. As the Guidelines application note explains, "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. 5(b)(ii); *see also Shonubi*, 998 F.3d at 89 (explaining how the "course of conduct" inquiry is "broader" than the "common scheme or plan" inquiry).

The Second Circuit has noted that "the 'same course of conduct' is defined apart from 'common scheme or plan' and looks to 'whether the defendant repeats the same type of criminal activity over time' without requiring that acts be connected by common participants or an overall scheme." *United States v. Azeem*, 946 F.2d 13, 16 (2d Cir. 1991) (quoting *United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir. 1991)). Thus, for example, the Second Circuit has concluded that a defendant engaged in the "same course of conduct" where the facts showed that he engaged in "bank frauds, perpetrated in the same style and with the same or similar documents and documentation, fit[ting] into an identifiable criminal behavior pattern." *United States v. McCormick*, 993 F.2d 1012, 1013 (2d Cir. 1992).

The Guidelines commentary goes on to list "[f]actors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct." U.S.S.G. § 1B1.3 cmt. 5(b)(ii). These factors

8

"include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Ibid.* "When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity." *Ibid.*

The Government argues that from 2006 to 2011 Stuck "misrepresented material facts regarding the financial health and anticipated returns of the Signal Lake entities and their portfolio companies" to "investors for his own benefit and to lull his victims," just as Stuck did to the FBI agent in 2015. Doc. #50 at 5. But, as the Guidelines application note suggests, the four-plus-year gap in time between the two sets of crimes requires a stronger showing of regularity and similarity to counter the absence of temporal proximity. *See United States v. Fermin*, 32 F.3d 674, 681 (2d Cir. 1994) (noting that "the Government cannot cite a single case in which transactions that occurred five or more years apart were considered part of the 'same course of conduct'"), *overruled on other grounds*, *Bailey v. United States*, 516 U.S. 137 (1995); *see also United States v. Damato*, 672 F.3d 832, 840-41 (10th Cir. 2012) (collecting "same course of conduct" cases in which "courts have repeatedly held that temporal proximity is lacking or that conduct is very remote when the interval exceeds one year").

In view of the very different factual context between the years when Stuck was actively soliciting investors for his funds from 2006 to 2011 and the one-off set-up incident in 2015 when he tried to dupe the FBI agent into paying a transaction fee, Stuck's charged conduct is neither similar nor regular enough to compensate for the absence of temporal proximity to his earlier activity. *See, e.g.*, *United States v. Cousineau*, 929 F.2d 64, 67-68 (2d Cir. 1991) (uncharged cocaine sales preceding charged conspiracy by as much as two years was properly included in

relevant conduct where defendant's methods of distribution remained "virtually unchanged" over that time); *United States v. Santiago*, 906 F.2d 867, 872-73 (2d Cir. 1990) (including as relevant conduct a defendant's drug sales that occurred between 8 and 14 months prior to offense of conviction because the defendant continued to sell "precisely as he had done earlier. . . .").

The Government tries to make up for the absence of temporal proximity by insisting that Stuck engaged in "lulling" conduct for the several years after he last accepted investor money in 2011. Doc. #56. But this "lulling" conduct is even more dissimilar to conduct involving the fraudulent taking of money.

Moreover, the focus of the "relevant conduct" determination is on conduct that will be used to enhance the "loss" calculation pursuant to Section 2B1.1. An apples-to-apples comparison requires me to look at the temporal gap between the dates when Stuck engaged in loss-causing conduct. As the Government acknowledges, the last loss-causing conduct with respect to Stuck's past investors occurred in April 2011—four-and-a-half years before the loss of $50,000 in October 2015. Doc. #56 at 10. The Government has not shown that Stuck's defrauding of an undercover FBI agent in 2015 was part of the "same course of conduct" as his alleged fraudulent investment activity from 2006 to 2011.

### *Downward variance*

Even if I were to agree with the Government's arguments that Stuck's alleged frauds from 2006 to 2011 should be counted as "relevant conduct" under the Sentencing Guidelines, I would likely exercise my discretion to vary downward from the resulting Guideline range. Because the parties have not briefed this issue, I will set forth my concerns subject to any further arguments the parties might wish to make.

A district court, of course, has authority to vary downward in light of the statutory sentencing factors of 18 U.S.C. § 3553 and on grounds of the court's reasoned policy disagreement with the application of the Sentencing Guidelines. *See, e.g.*, *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *United States v. Bonilla*, 618 F.3d 102, 110 (2d Cir. 2010). My concern here is with the use of uncharged "relevant conduct" that occurred more than four years before the crime of conviction in order to quadruple a defendant's sentence. Indeed, most of the Government's claimed investor losses occurred from 2006 to 2008—some seven to nine years before the wire fraud that occurred in 2015 and was charged in the indictment.

The use of stale, uncharged conduct to consign a defendant to a prison cell for multiple more years than he would otherwise face raises basic fairness and appearance-of-fairness concerns. It implicates a court's duty to impose a sentence that will "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). A sentence should promote not only a *defendant's* respect for the law but the *public's* respect for the law as well. "Our government is the potent, the omnipresent teacher," and "[f]or good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

I think the public would be surprised and even alarmed to learn that, if a person pleads guilty to one crime, a judge is free to wallop him with a quadruple-enhanced prison sentence on the grounds of something worse from many years before that the prosecutor never saw fit to charge as a crime.[6] The indictment in this case charges Stuck with a wire fraud scheme in 2015-

---

[6] *See* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681, 1714 (1992) ("Most lawyers, as well as ordinary citizens unfamiliar with the daily procedures of criminal law administration, are astonished to learn that a person in this society may be sentenced to prison on the basis of conduct of which a jury has acquitted him, or on the basis of charges that did not result in conviction."); *see also United States v. Vigil*, 476 F. Supp. 2d 1231, 1311 (D.N.M. 2007) (concluding that a variance would promote respect for the law more than a Guidelines sentence that was "substantially the result of [relevant]

2016, not a wire fraud scheme from 2006-2011. The use of stale, uncharged conduct to multiply a sentence raises the question why the Government did not charge the 2006-2011 conduct as a crime in the first instance so that Stuck might have had the benefit of his right to a jury determination whether the Government could prove beyond a reasonable doubt that he engaged in the massive fraud that the Government claims.

The federal wire fraud statute is subject to a five-year statute of limitations. *See* 18 U.S.C. § 3282. Based on the nearly seven-year gap between the last investor loss in April 2011 and the return of the indictment in this case in February 2018, there is some doubt whether Stuck's prior investor fraud from 2006 to 2011 is time-barred. Yet, even if the Government might have creatively framed an indictment to avoid a limitations problem, the fact remains that the actual losses from Stuck's alleged investor frauds are uncharged and very old. They seem too old and distinct, in my view, to use to multiply his prison sentence.[7]

## CONCLUSION

For the foregoing reasons, the Court concludes that the alleged investor losses from 2006 to 2011 may not be included as "relevant conduct" under the Sentencing Guidelines. Even if the Court were to conclude that this conduct fell within the scope of "relevant conduct," the Court would likely vary downward to offset the additional offense levels attributable to consideration of such stale, uncharged conduct. Consistent with the Court's authority to consider all information that may be relevant to a defendant's background and character, this ruling is

---

conduct for which the United States chose not to charge [the defendant] and twenty-three counts for which [he] was acquitted," which increased the defendant's offense level by twelve levels above where it would have been had his sentence been calculated solely on his offense of conviction), *aff'd*, 523 F.3d 1258 (10th Cir. 2008).

[7] I recognize that time-barred conduct may be counted as "relevant conduct" for sentencing. *See, e.g.*, *United States v. Praddy*, 725 F.3d 147, 157 (2d Cir. 2013). The question here is whether it is fair to do so when the result is a massive increase in the Guidelines offense level.

without prejudice to any argument the Government might make about Stuck's background, character, and conduct, as well as what sentence within the applicable Guidelines range would be appropriate for the Court to impose. *See United States v. Broxmeyer*, 699 F.3d 265, 268 (2d Cir. 2012) (citing 18 U.S.C. § 3661).

It is so ordered.

Dated at New Haven, Connecticut this 19th day of November 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge