UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.   3:18-cr-00028-JAM |
| vs. | : | |
| | : | |
| BARTON STUCK | | April 16, 2020 |

## DEFENDANT'S  MEMORANDUM IN AID OF SENTENCING

In anticipation of sentencing in this matter, Defendant submits the following memorandum. As explained below, although the Sentencing Guidelines recommend a sentence of up to 12 to 18 months' incarceration, the Court should impose a non-prison probationary sentence.

## BACKGROUND

Barton Stuck is 73 years old, and he has a lifetime of intellectual contributions to look back on. After submitting his dissertation in space satellite dynamics to the Massachusetts Institute of Technology,[1] he turned down tenure-track academic job offers to join the research department at Bell Labs. Over the ensuing dozen hears he authored or co-authored 40 scholarly articles, many addressing the scientific and technical principles supporting the infrastructure of telecommunications networks, and he worked on developing a core element of the UNIX computer operating language. After leaving Bell Labs following the breakup of AT&T, he spent the next 14 years as a consultant for major investors in the telecom industry while continuing to publish articles,

---

[1] https://eecs-newsletter.mit.edu/articles/2009-fall/eecs-alums-major-players-and-thinkers/4/

now focused more on technical and scientific issues arising in telecommunications as a field of industry. While in this consulting capacity Bart was also able to invest his own funds in promising companies. His personal investments in telecom companies during this era left him, by 1999, with enough personal capital to start an investment group of his own, which he named Signal Lake. He was 51 years old, and the world was at his feet.

Today, at 73 years old, Bart's world lies in ruins at his feet. He lives in a studio apartment. A mattress in one corner serves as his bed and couch. The only other furniture in the living space, save a small TV stand, is a rickety kitchen table surrounded by partially broken chairs. Living this way, his social security benefit are sufficient to keep his head above water, if not his neck.

For a person who lived much of his adult life living as a wealthy man in Westport, these material conditions at the bottom of his long fall might be expected to be the focal point of existential consternation. But Bart hardly seems to notice. Instead, for Bart the loss is not so much a matter of what he has, but rather of who he is: a person whose technical expertise, judgment, and opinion matters enough to move money. And all that has been slipping away now for a decade.

Or maybe Signal Lake, sailing under an unlucky star, was doomed from its start twenty years ago. A recent New Yorker article aptly analogizes the operation of venture capital vehicles to nineteenth century whaling ventures, which typically ended in utter disaster—but occasionally paid off spectacularly:

> In "V.C.: An American History," the Harvard Business School professor Tom Nicholas sees whaling as the first practice of what we now call venture capital: collecting large pots of money and using it to invest in young companies, while also getting involved in their management, in the hope of guiding growth and generating huge returns. Venture capitalists fill these cash pots, or funds, with money from large-scale investors—foundations, pension funds, university endowments, and other passive contributors. They take a management fee, drop a bit of their own money into the mix, and, like the whaling agents, promise expertise. They, too, make predominantly bad bets: about eighty per cent of venture investments don't

pay off. Occasionally, though, there is a wild success, and, since the nineteen-seventies, such successes have transformed American business.[2]

Signal Lake hit stormy weather almost as soon as it set sail. The fund began in 1999, at the outset of what later would be recognized as the "dot-com bubble." When the bubble burst in 2000, Signal Lake suffered substantial losses, but some of the companies in its investment portfolio (including InPhase, a spinoff company working on technology originally developed at Bell Labs) weathered the storm and carried on. Signal Lake continued to sustain these companies with infusions of capital both from outside investors and from Bart Stuck himself. Bart had invested approximately $1 million of his own money in 1999, and in the ensuing years he continued to invest, bringing his total investment to just under $7 million in cash. (He also deferred extracting millions more in standard management fees).[3]

The most promising company in Signal Lake's portfolio, InPhase, developed holographic storage technology that by 2005 had been successfully used to broadcast content by Turner Media. But InPhase too struggled to attract sufficient later-stage capital investment from sources other than Signal Lake (and one other venture fund), a situation exacerbated by the financial crisis of 2008. By 2010 InPhase was bankrupt, and after Signal Lake failed to successfully bring the company out of

---

[2] https://www.newyorker.com/magazine/2020/01/27/is-venture-capital-worth-the-risk.

[3] Mr. Stuck's investments in Signal Lake's various funding vehicles are as follows:

| Dates | Amount ($M) |
|---|---|
| 1999-2000 | $1.575 |
| 2000-2002 | $1.000 |
| 2004-2005 | $2.273 |
| 2007-2015 | $1.891 |
| **1999 - 2015** | **$6.739** |

3

bankruptcy status, it became clear that Signal Lake, with no viable companies left in its portfolio, had crashed upon the shoals.

For Bart Stuck, now in his 60s and with nothing to show for his $11 million investment in Signal Lake, this failure was not something he could fully comprehend, let alone accept. In the ensuing years, he kept the lights on at Signal Lake. Though he sent tax documents to investors making clear that their investments were now virtually worthless, in private exchanges he expressed hope to investors that he would be able to turn things around. Bart's unfounded optimism arose from an acquaintance with Mark Anthony Owenby, a man who (to all outside appearances) fraudulently claimed to be extremely wealthy and who wanted to buy out Signal Lake's investors in order to continue making tech-sector investments with Bart Stuck.

As the (non-existent) money from Owenby continued to fail to materialize, fissures in Bart's own material existence grew. Investor lawsuits piled up. He began running out of money. His relationship with his wife frayed. And still, through all of this, Bart Stuck, a rational scientist, held out what can only be described as blind faith that the tragedy of his later life would be redeemed by a plot device straight out of Greek tragedy: the *deus ex machine*. Mark Owenby, Bart believed, would swoop in at the end with $200 million, enough to pay back investors double their initial investment and save the day. But Mark Anthony Owenby, for all his machinations, is no god.

Five years after the 2010 bankruptcy of InPhase and three years after Bart had given up hope of soliciting new investments to rescue the company, as Bart continued to keep Signal Lake alive, an opportunity to obtain a modicum of financial reprieve seemed to fall into Bart's lap. An outside investor, wealthy and arrogant, wanted to buy out an existing investor. For the buyout to occur, Bart would have to bless the transaction. His price for doing so: $50,000. Bart, couching the figure as a loan to cover legal and accounting expenses, lied to the investor about the existence of an *actual*

4

sum of $200 million available to Signal Lake. Bart knew that money was not actually sitting in a Signal Lake account. And he knew that without that money there would be no legal or accounting expenses paid to put Signal Lake in good standing. Even as he hoped that the $200 million would arrive, he knew it was not there. And he knew the $50,000 would not go to accountants or lawyers. Over half of the amount, instead, would go to Owenby, who claimed despite his spectacular wealth to have liquidity issues.

## DISCUSSION

Mr. Stuck asks this Court to impose a sentence of probation in lieu of incarceration. Mr. Stuck is eligible for a sentence of one to five years of probation. 18 U.S.C. § 3561(c)(1). Although the Guidelines calculations suggest 12 to 18 months of imprisonment and three years of supervised release, the circumstances of Mr. Stucks's case weigh in favor of a non-Guidelines, non-prison sentence.

**A. The properly calculated Guidelines call (at most) for a sentence of 12 to 18 months.**

The base offense level in this case is 7. That level is increased by 6 levels due to a loss amount of $50,000. The Presentence Report contains allegations regarding further losses from 2012 and earlier. For the reasons set forth in the Court's November 19, 2019, order regarding the scope of offense conduct, these claims fall outside the scope of the offense in this case. Defendant disagrees with certain characterizations in this portion of the PSR regarding the period outside the actual offense conduct and does not believe they should be included as offense conduct. However, because they do not relate to offense conduct Defendant submits that the court need not resolve the question of the accuracy of these claims.

The offense level is increased by one level because Mr. Stuck pled guilty to money laundering based upon his transfer of over half of the $50,000 in government funds to Mark Owenby, bringing the offense level to 14.

The PSR calculates a further two-level enhancement for obstruction of justice on the grounds that "Mr. Stuck made material misrepresentations to the FBI agents and the Connecticut Department of Banking after he knew he was being investigated for the instant offense. Further, he continued to make lulling misrepresentations to investors after he had been indicted in this case, conduct which ceased just 24 days prior to his entering a guilty plea to all four counts of the Indictment." PSR ¶ 96.

The parties in their plea agreement did not specifically contemplate an obstruction enhancement (though the plea agreement does not exclude the government from seeking an enhancement). As discussed below, there are substantial legal grounds for questioning the applicability of this enhancement here. Defendant submits, however, that the Court likely need not resolve these legal questions. As set forth in the plea agreement, the Government agrees Mr. Stuck should receive a three-level offense level reduction for acceptance of responsibility, assuming an offense level of 16 or higher. Application of this enhancement would result in a final offense level of 13 after removing three levels for acceptance. Without the enhancement, the final offense level is 12 after removing two levels for acceptance. This distinction translates in a two-month difference in the recommended Guidelines range of either 10 – 16 or 12 – 18 months. Because of the limited impact of this enhancement in the context of the case, Defendant submits that the Court need not determine whether the enhancement applies. For the reasons below, however, the facts of this case do not properly trigger the enhancement.

The PSR references first Mr. Stuck's statements to the CT Banking Commission. Mr. Stuck acknowledges that before the CT Banking Commission on January 26, 2016, he made an untrue statement that Signal Lake's books were professionally audited. Although Signal Lake had for the majority of its existence employed an outside auditing firm, after the fund became financially insolvent the firm had ceased its auditing role for want of payment. Mr. Stuck made effectively this same untrue statement in SEC forms on October 28, 2016, and March 17, 2017. These statements constitute counts 3 and 4 of the indictment.

While the CT banking investigation was an official investigation, it was not at that point an investigation into Mr. Stuck's statements to the SEC because those statements had not yet been made. More, the investigation related primarily to issues that the Court has determined fall outside the scope of the offense conduct in this case.

Additionally, the PSR points to statements made by Mr. Stuck during an FBI interview that reiterated statements made to the FBI undercover. Such unsworn statements, even if false, ordinarily will not trigger an enhancement under USSG § 3C1.1 unless the misstatements materially hinder the investigation. USSG § 3C1.1 Application Note 5 lists conduct that the provision ordinarily does not cover, including "making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies." Note 4(G) concerns statements to law enforcement that "significantly obstructed or impeded the official investigation or prosecution of the instant offense." There does not appear to have been any such consequence here.

**B. The governing legal standard requires the Court to impose the sentence that is minimally sufficient to accomplish the purposes of a criminal sentence.**

While the Court is required to consider the range of penalties suggested by the Guidelines in determining the appropriate sentence in a given case, it is not bound by that range. Rather, it is bound by the dictate of 18 U.S.C. § 3553(a) that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2)]." Those purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training; medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). As the Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the consequence of this provision is that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id*. at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

**C. Mr. Stuck's history and character weigh in favor of a non-prison sentence.**

The professional life story described above reflects that in a very literal sense Bart Stuck has lived his life as a productive member of society. And in this sense the term "productive" is important in that it distinguishes him not from those who lived their lives engaged in routine illegal activity (Mr. Stuck's social and economic background saved him from that path), but rather because

8

it separates him from many others to whom the term "investor" might apply. At Bell Labs, Bart put his skills to use building and designing some of the fundamental architecture of telecommunications. In his later years, he worked to build companies making use of that architecture. The tragedy of Bart's life today is not that he has lost his small fortune, but that many of the things he tried to build later in life came apart, despite his care and skill as an engineer.

But it would be wrong to emphasize, among the things Bart has built, only his professional output. In his letter attached as **Exhibit 1**, Bart's younger brother shares some of his memories of how Bart has built and sustained his family in ways large and small. Byron recalls first Bart's role in their mother's life:

> Bart and I lost our Dad when he was 20 and away at college. That meant that he and I were the primary support system for my mother into her later years. My mother lived on to 92 Y.O. and Bart was always much more vigilant about calling her and did so every Sunday. He was not just "the older son" that looked out for her, but continued through her life to be her major support system.

Byron goes on to explain the role that Bart has played as a source of support to Byron's children and later to his own adopted son:

> He has also been very caring for children. He contributed significant sums towards my daughter and son's college educations. Later in life he and his wife adopted at 7 Y.O. their son, Emil, from an orphanage in Bulgaria. Bart and his wife invested immense time and effort into helping Emil get past those beginning years of his life at the orphanage. Those were very hard years for Emil and he developed coping skills that were later very difficult for him to manage. Bart to this day continues to advocate and care for Emil and help him develop, in spite of the immense challenges he continues to present.

As Byron's letter suggests, Emil, who just spent his 30th birthday detained in the Bridgeport Correctional Center, never recovered from the extreme adversities he experienced as a young child, and has struggled his entire life with addiction and associated petty criminality. Bart, however, has never turned his back, and until Emil's recent detention he was living with Bart in his small apartment.

Bart's efforts with Emil also led him (and his now-ex-wife) to become involved in the Unitarian Universalist Church, an involvement that he has sustained over the past two decades. As the church's choir minister attests in his letter attached as **Exhibit 2**:

> As one of the ministers of this church I have known Mr. Stuck for over twenty years. During that time I have witnessed him work in various capacities: leadership, choir member, general member of the congregation. He has always been a gentle, honest and supportive presence. His care is genuine and his concern for those in need is outstanding. When he says he will get things done, he does. He is a person that I trust and I am glad that he is a member of our community.

The church's senior minister likewise shares his impression of Bart, writing in the letter attached as **Exhibit 3** that "I have always found Bart to be honest and upstanding to all those who meet him. He truly cares for others and is often one of the first to give to those in need and to offer his presence to those who are struggling. As a leader in our congregation he has made our world a much better place."

For his part, Bart shares in the letter attached as **Exhibit 4**:

> Irrespective of what the Court decides should be my punishment, my life as I have known it is now largely destroyed.  As someone with negative net worth and no means of earning a substantial living, I will be living in extremely reduced circumstances for the remainder of my life.  My wife divorced me after 43 years of marriage and distanced herself from our son from Bulgaria, whom we adopted in 1998; he has been in and out of Connecticut and New York (Rikers Island) correctional facilities in part reacting to the trauma he encountered in Bulgaria, and I am his sole support going forward in his life.  I suffered a heart attack one week after receiving a search warrant in this case in 2016.  And I am still facing legal actions with other entities and people that interacted with Signal Lake that will further reduce my assets.
>
> To the extent that I have any goals aside from sheer survival in the years left to me, they are twofold.  First, as a part of my active involvement in the Unitarian Universalist faith with the Westport CT congregation, I have been focusing on the value of atonement for bad acts and providing charity, forgiveness and love to others in need.  This has led to sincere remorse for my actions, and a determination to undertake acts of good works in response.  I did wrong, so now I should focus on doing right.   Secondly, as the adoptive father of a severely troubled adopted son, I wish to devote my efforts to helping him become a self-sufficient and law abiding citizen.

**D. Mr. Stuck's age (73) and his physical condition weigh in favor of a non-Guidelines, non-prison sentence.**

Section 5H1.1 of the Guidelines provides that age "may be relevant in determining whether a departure is warranted, if considerations based on age, individually, or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment, such as home confinement, might be equally efficient as, and less costly than, incarceration." U.S.S.G. § 5H1.1. Similarly, section 5H1.4 of the Guidelines provides that "physical condition or appearance, including physique," may be relevant in determining whether a departure is warranted.

Mr. Stuck is 73 years old, and although he is in reasonably good health at the moment, he has a history of heart problems. Specifically, two days after federal agents seized documents from him related to this case, he suffered a heart attack. The Court should consider his age and physical condition when fashioning an appropriate sentence. As discussed below, a term of incarceration would be much harsher and frankly more perilous for Mr. Stuck than it would be for someone younger and in better health. Mr. Stuck's age is also relevant for the Court to consider because it makes him less likely to recidivate.

First and most acutely, as a 73-year-old man with a history of heart problems, Mr. Stuck has cause on multiple fronts to be especially concerned about the consequences of Covid-19 exposure. The CDC warns that "[o]lder adults, 65 years and older, are at higher risk for severe illness,"[4] and a

---

[4] https://www.cdc.gov/aging/covid19-guidance.html.

recent study reported that approximately 75% of those hospitalized with the disease were at least 50 years old, while patients over age 65 ended up hospitalized at three times the rate of the general population. *Id*. Mr. Stuck's underlying heart condition represents yet another real risk factor.

Summarizing the medical context and consequences of COVID-19 for prison inmates even without Mr. Stuck's particular circumstances, a prominent group of Yale School of Medicine "medical professionals and experts in infectious disease and/or prison populations" recently wrote to Connecticut Supreme Court Associate Justice Andrew J. McDonald that "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." **Exhibit 5** (Mar. 27, 2020 Ltr. to Justice McDonald) at 1. This is because detainees "have much less of an opportunity to protect themselves by social distancing than they would in the community." The letter summarizes many of the other reasons that jails and prisons are ideal settings for the rapid transmission of infectious diseases, as well as their relatively limited ability to adequately treat the virus: "few state or federal prison systems have adequate (or any) pandemic preparedness plans in place." Id. at 5. This means that "individuals placed in . . . prisons are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected."[5] Id. at 6. The urgency is clear, and the authors implored that "[t]he time to act is now." Id. at 5. "Once a case of COVID-19 [is] identified in a facility, it will likely be too late to prevent a widespread outbreak." The authors therefore urged a reduction in the size of the prison population. Id. at 6–7 ("[I]t is our strong opinion that individuals who can safely and

---

[5] There is no reason to believe that the situation at Wyatt is materially different than in Connecticut's prisons.

12

appropriately remain in the community not be placed in . . . prisons at this time.").

These specific concerns relating to Covid-19, moreover, exacerbate the background problem that federal prisons are ill equipped to properly house and care for a person of Mr. Stuck's age. BOP data shows that aging inmates put a strain on the resources of correctional institutions, because aging inmates have higher average medical costs and require more medical care inside and outside of prison. *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL 14 (May 2015, revised Feb. 2016). Notably, the BOP defines the special population of "aging inmates" as anyone over 50. Mr. Stuck entered this category over two decades ago.

Aging inmates are more likely than other inmates to suffer from chronic conditions requiring more numerous medical visits. A Justice Department report also found that BOP institutions are not appropriately staffed to attend to these needs. In particular, because institutions have a shortage of Correctional Officers available to staff trips for outside medical care, aging inmates frequently suffer delays in receiving such care. *Id.* at 16–17. Inmates at certain BOP institutions may wait on average of 114 days to see outside medical specialists. *Id.* at 18. Further, BOP institutions lack specialized programs to train staff to recognize aging inmates' needs, physical infrastructure to accommodate aging inmates' decreased mobility, and programming specifically addressed to meet the needs of aging inmates. *Id.* at b–c.

The BOP's inability to address the needs of aging inmates also underscores why a term of imprisonment would be more burdensome—and more dangerous—for Mr. Stuck than it would be for someone younger and in better health. In short, prison ages people. By several estimates, "prisoners' physiological age averages 10 to 15 years older than their chronological age." Brie A. Williams, et al., *Aging in Correctional Custody:  Setting a Policy Agenda for Older Prisoner Health*

*Care*, 6 AMERICAN J. OF PUBLIC HEALTH 1475, 1477 (2012). A 2013 statistical analysis based upon ten years' worth of data from New York State parolees has shown, "for each year served in prison, a person could expect to lose approximately two years of life." Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State,* 1989–2003, AMERICAN J. OF PUB. HEALTH 523, 526 (2013).

At 73 years old, Mr. Stuck cannot afford to age more rapidly. He is quickly approaching the average life expectancy for white males in the United States. Elizabeth Arias, et al., *United States Life Tables, 2014*, NATIONAL VITAL STATISTICS REPORTS 17 (August 14, 2017), available at https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_04.pdf (indicating that average life expectancy for white males is 76.7 years). Even a short period of time in prison would severely impact Mr. Stuck's health and his life expectancy. While Mr. Stuck's conduct in this case was serious, the purposes of sentencing can be fulfilled without putting his life at risk.

In addition to raising concerns regarding the conditions of confinement in the BOP, Mr. Stuck's age also substantially reduces his statistical likelihood of recidivism. Many courts have relied upon recidivism statistics from the United States Sentencing Commission in deciding to impose a below- or non-Guidelines sentence. *See*, *e.g.*, *United States v. Aguilera*, 2008 WL 4830802, at *3 (E.D. Wis. Oct. 28, 2008) (citing U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) [hereinafter, "*Recidivism Report*"]); *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citing *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* 15 (Jan. 4, 2005)); *cf. United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (vacating and remanding for resentencing because district court imposed above-Guidelines sentence without addressing Sentencing Commission's recidivism

statistics on age). Relying on statistical analyses in numerous categories over a fifteen-year period, the Sentencing Commission has found that recidivism rates are strongly correlated with various factors, including age. *See Recidivism Report*.

The Sentencing Commission's report found that "[r]ecidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." *Id*. at 12. Offenders over the age of 50 have a recidivism rate of 9.5 percent, while offenders under age 21 have a recidivism rate of 35.5 percent. *Id.* at 28 (Ex. 9). Thus, Mr. Stuck's age strongly suggests that he is unlikely to recidivate and hence that the Guidelines overstate the need to protect the public. *See Payton*, 754 F.3d at 379 (holding that district court committed procedural error in failing to consider the Sentencing Commission's recidivism statistics on age).

Prior criminal history is also a strong predictor of recidivism. Mr. Stuck's lack of criminal history coupled with his age makes him extremely unlikely to reoffend. The recidivism risk for offenders over 50 in Criminal History Category I is only 6.2 percent. *Id.* Moreover, Mr. Stuck has even less of a criminal history than many other defendants who fall into Criminal History Category I and is more akin to a first offender. "There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I." *Germosen*, 473 F. Supp. 2d at 227 (citing Michael Edmund O'Neill, *Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System*, 42 B.C. L.REV. 291 (2001)

### E.  A sentence of probation is sufficiently punitive.

A five-year sentence of probation is sufficient to provide just punishment and reflect the seriousness of Mr. Bright's offense. As the Supreme Court has recognized, while "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," individuals under probationary supervision are

15

> nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48 (2007) (citations omitted). Probation or supervised release is rehabilitative and constructive in a way that prison categorically is not, *see* 18 U.S.C. § 3582(a), but the conditions of release are a far cry from "the absolute liberty to which every citizen is entitled." *Id.* (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001).

This is particularly true in cases where the Court imposes a period of home confinement as a condition of probation. As reflected in the Sentencing Commission's endorsement of home confinement in cases of certain defendants, home confinement is in certain circumstances a more efficient means of achieving the punitive effect of formal incarceration. *See* USSG § 5H1.1. Indeed, elsewhere the Guidelines specify that [h]ome detention may be imposed as a condition of supervised release, *but only as a substitute for imprisonment*." U.S.S.G. § 5D1.3(e)(2) (emphasis added). Home detention, that is to say, is an alternative to imprisonment—but it is not an alternative to punishment. *See, e.g.,* United States v. McCain, No. 08-CR-172, 2009 WL 3047889, at *4 (E.D. Wis. Sept. 22, 2009) ("In order to ensure necessary punishment and structure, I ordered a period of home confinement as a condition of probation.").

Finally, even a sentence of probation carries with it the full weight of collateral consequences that come with a federal felony conviction. Because of his conduct in this case, Bart Stuck is now—and will be for the rest of his life—a convicted felon. This is a life-altering mark. As a Court in the Eastern District of New York recently outlined,

> Remarkably, there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons. Of those, federal law

16

> imposes nearly 1,200 collateral consequences for convictions generally, and nearly 300 for controlled-substances offenses. District courts have no discretion to decide whether many of these collateral consequences should apply to particular offenders. The result is a status-based regulatory scheme; by the very fact of an individual's conviction, he or she is subject to a vast array of restrictions.
>
> The range of subject matter that collateral consequences cover can be particularly disruptive to an ex-convict's efforts at rehabilitation and reintegration into society. As examples, under federal law alone, a felony conviction may render an individual ineligible for public housing, section 8 vouchers, Social Security Act benefits, supplemental nutritional benefits, student loans, the Hope Scholarship tax credit, and Legal Services Corporation representation in public-housing eviction proceedings. Moreover, in addition to the general reluctance of private employers to hire ex-convicts, felony convictions disqualify individuals from holding various positions.

*United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016) (footnotes omitted).[6] As the court further explained, the Second Circuit has approved of courts including consideration of these consequences in crafting an appropriate sentence under § 3553(a). *Id.* at *7 - *8; *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (stating that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence").

### F. A sentence of probation achieves adequate deterrence.

As discussed above, Mr. Stuck's age and lack of criminal history make him unlikely to reoffend in the future. Because he has never before served a sentence of probation or any time in prison, a five-year probation sentence will be perceived and experienced by him as quite severe. It will also be very difficult for him to reoffend, given that, as even Mr. Stuck now acknowledges,

---

[6] The United States appealed the decision in this matter but subsequently withdrew the appeal. *See* Second Circuit Case 16-2081 Document 27.

Signal Lake is well and truly dead. Finally, he has demonstrated remorse for his actions. Given all of these factors, a sentence of probation would provide adequate specific deterrence.

As for general deterrence, it is not clear that the severity of a sentence (as opposed to the certainty of the imposition of some sentence) has any significant general deterrent value. In a recent study of drug offenders sentenced in the District of Columbia, researchers tracked over a thousand offenders whose sentences varied substantially in terms of prison and probation time. Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism Among Drug Offenders*, 48-2 CRIMINOLOGY 357 (2010). The results showed that "incarceration seems to have little net effect on the likelihood of subsequent rearrest." *Id*. at 381. "Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame." *Id*. at 382. In other words, "at least among those facing drug-related charges, incarceration and supervision seem not to deter subsequent criminal behavior." *Id*. Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. It examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." The report concludes that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

G. **A Guidelines Sentence Would Lead to Unwarranted Sentence Disparity.**

Congress requires sentencing courts to "consider the need for the sentence imposed to provide . . . just punishment" while simultaneously considering the "need to avoid unwarranted sentence disparities among defendants with similar backgrounds who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2) and (a)(6). Thus, a just punishment includes the concept that a just sentence is one that avoids the creation of unwarranted sentencing disparity. It is well-established that a guidelines sentence may create an unwarranted sentencing disparity, and here, imposition of a sentence within the guideline range would realize this very result. *United States v. De La Cruz*, 397 Fed. Appx. 676, 678-79 (2d Cir. 2010) (citing *Kimbrough*, 552 U.S. at 91).

As the Sentencing Commission's statistical analyses from 2017 show, in the Second Circuit only approximately 27.5% of white collar (namely fraud) cases resulted in within-Guidelines sentences, and less than 1% resulted in an above-Guidelines sentence. United States Sentencing Commission Statistical Information Packet Fiscal Year 2017, Second Circuit at 20.[7] The remaining approximately 72.5% of cases resulted in a below-Guidelines sentence. *Id*. Approximately 58% of offenders received a non-prison sentence. *Id*. at 10.

## CONCLUSION

For the reasons above, Defendant respectfully requests that the Court impose a non-prison sentence.

---

[7] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2016/2c16.pdf.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | THE DEFENDANT,<br>Barton Stuck |
|  | OFFICE OF THE FEDERAL DEFENDER |
| Dated: April 16, 2020 | /s/ James P. Maguire<br>James P. Maguire<br>Assistant Federal Defender<br>265 Church Street, Suite 702<br>New Haven, CT 06510<br>Phone: (203) 498-4200<br>Bar No.: ct29355<br>Email: James_Maguire@fd.org |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 16, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James P. Maguire
James P. Maguire